UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Cincinnati Insurance Company, | File No. 19-cv-1025 (ECT/TNL) |
| Plaintiff and Counter-Defendant, | |
| v. | |
| Rymer Companies, LLC, *a/k/a* Rymer Companies, Inc., and Cannon Falls Mall, Inc., | **OPINION AND ORDER** |
| Defendants and Counter-Claimants. | |

Anthony J. Kane and Jessica K. Allen, Pfefferle Kane LLP, Minneapolis, MN, for Plaintiff and Counter-Defendant Cincinnati Insurance Company.

Bradley K. Hammond and Alexander M. Jadin, Smith Jadin Johnson, PLLC, Bloomington, MN, for Defendants and Counter-Claimants Rymer Companies, LLC and Cannon Falls Mall, Inc.

The roof on the Cannon Falls Mall was in rough shape. It often leaked. Roofing materials had been infiltrated by water, leaving them saturated (or "wet," in industry parlance). The roof displayed numerous other signs suggesting it needed extensive repairs. In 2014, in fact, a consultant recommended replacing the entire roof "as soon as possible." But that did not happen. Then came a storm.

The storm occurred on September 4, 2018. The Mall's owners—two business organizations that will be referred to together as "Rymer"—believed the storm caused extensive damage to the roof, and they submitted a claim to the Mall's insurer, Cincinnati Insurance Company. Rymer's roof-damage claim eventually would total more than $1.7 million. A panel appointed to appraise the roof damage essentially rejected Rymer's claim.

It determined that the storm's wind caused just $23,225 worth of damage to the Mall's roof.

The remaining dispute in this case stems from what happened next: Rymer applied for a building permit necessary to repair the wind damage identified by the appraisal panel, but Goodhue County denied the application. According to Rymer, the County determined that the roof's generalized "wet" condition meant the localized repairs authorized by the appraisal panel could not be performed without replacing the Mall's entire roof. Rymer says that the County's denial of its building permit triggered a provision in the Cincinnati policy providing coverage when, as Rymer describes the provision, an insured incurs added costs for complying with an ordinance or law.

The Parties have filed cross-motions for summary judgment that, boiled down, require deciding whether the ordinance-or-law coverage provision relied on by Rymer requires Cincinnati to cover the cost to replace the Mall's entire roof in view of Goodhue County's rejection of Rymer's building permit. Cincinnati's motion will be granted, and Rymer's motion will be denied, because the ordinance-or-law coverage provision unambiguously requires a but-for causal connection between the storm and the enforcement of an ordinance or law, and that connection is missing here as a matter of law.

I

*The Parties.* Two business organizations—Rymer Companies, LLC (which is also known as Rymer Companies, Inc.) and Cannon Falls Mall, Inc. (together "Rymer")—own the Mall. Answer and Countercl. at 3 ¶ 2 [ECF No. 6]; Reply to Countercl. ¶ 3 [ECF No. 14]. Rymer Companies, LLC has just two individual members—Edward Rymer and

Paulette Rymer—and they are Florida citizens. *See* Statement of Citizenship [ECF No. 63]. Cannon Falls Mall, Inc. is incorporated under Minnesota law and maintains its principal place of business in Florida. Compl. ¶ 3 [ECF No. 2]; Answer and Countercl. at 1 ¶ 2.[1] Rymer contracted with Cincinnati to provide insurance coverage for the Mall under a policy effective from July 15, 2016 to July 15, 2019. *See* Hammond Aff., Ex. A [ECF No. 33-1 at 1–152] ("Policy").[2] Cincinnati is incorporated under Ohio law and maintains its principal place of business there. Compl. ¶ 1.

*The basic terms of the Policy.* The Policy covers "direct physical 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." Policy at 28. The Policy defines "loss" to "mean[] accidental loss or damage." *Id.* at 59. The Mall (*i.e.*, the "building or structure" that is the Mall) is "Covered Property." *Id.* at 4, 28. And a "Covered Cause of Loss" is one that is not excluded or limited by the Policy. *Id.* at 30. The Policy neither excludes nor limits coverage generally for loss caused by windstorms. *See id.* at 30–36.

*The storm.* On September 20, 2018, a thunderstorm moved through the Cannon Falls area. The National Weather Service reported that around 7:00 p.m. that evening "an EF-1 tornado touched down south-southwest of Cannon Falls . . . and traveled north-

---

[1] Rymer Companies, LLC and Cannon Falls Mall, Inc. admitted the Complaint's basic allegations regarding their organizational status, but only "[o]n information and belief." Answer and Countercl. at 1 ¶ 2. There is no apparent reason why this would have been necessary or justified.

[2] The Policy and all other filed materials will be cited by reference to the pagination assigned by CM/ECF (appearing at the top right corner of each page), not by reference to their original pagination.

northeast for approximately 1.7 miles." Kane Aff., Ex. A-9 at 61 [ECF No. 51-1]. The tornado's "maximum width was estimated to be approximately 100 yards[,]" and it produced maximum wind speeds between 85 and 95 miles per hour. *Id.* Based on maps showing the tornado's track, "tornado-strength winds were no closer than one-quarter to one-third of a mile from the [Mall]." *Id.* at 61–62. (These facts regarding the storm and tornado appear in a report prepared at Cincinnati's request by Pie Consulting & Engineering, *id.* at 60–97, and neither Cincinnati nor Rymer disputes their accuracy.)

*Rymer's claim under the Policy and Cincinnati's decision.* On September 24, 2018, Rymer filed a claim with Cincinnati for damage to the Mall caused by wind from the September 20 tornado. Kane Aff., Ex. A-8 at 56–58. Rymer did not at that time identify a probable amount of the loss. *See id.* at 56. In a subsequent proof-of-loss submission to Cincinnati, Rymer identified the amount of its claimed loss to be $1,541,699.84. Kane Aff., Ex. A-15 at 159. Cincinnati alleges it "determined that the total damage to the Mall as a result of the September 20, 2018 storm was $10,702.40, exclusive of depreciation and the applicable deductible[,]" and tendered payment in this amount to Rymer in October 2018. Compl. ¶¶ 11–12.

*The Parties' claims in this lawsuit.* Cincinnati commenced this lawsuit with the filing of its Complaint in April 2019. ECF No. 2. Invoking diversity jurisdiction under 28 U.S.C. § 1332(a)(1), Compl. ¶ 4,[3] Cincinnati asserted a single cause of action under Minnesota statutes authorizing the issuance of declaratory judgments, *id.* ¶¶ 19–21 (citing

---

[3]      The presence of complete diversity coupled with the amount in controversy means there is subject-matter jurisdiction over this case. 28 U.S.C. § 1332(a)(1).

Minn. Stat. §§ 555.01, 555.02, and 555.11).[4]  Cincinnati sought various forms of declaratory relief, including the adjudication of, and a declaration regarding, the Parties' "contractual obligations under the terms of the Policy[.]"  Compl. at 7, ¶ 1.  Rymer answered and counterclaimed, alleging that Cincinnati had "breached the Policy by failing to fully and fairly adjust and pay the [l]oss."  Answer and Countercl. at 5 ¶ 14.  Rymer sought damages for Cincinnati's breach, *id.* at 5 ¶ 15, a declaration that Rymer was covered under the Policy in the amount of its claimed loss, *id.* at 5 ¶ 19, and an order compelling an appraisal under the Policy, *id.* at 6 ¶ 22.

*The appraisal.*  In September 2019, the Parties stipulated to stay proceedings in this case pending completion of an appraisal pursuant to an appraisal-authorizing Policy term.  Stip. ¶ 5 [ECF No. 17].[5]  In their stipulation, the Parties wrote that they "agree[d] that an

---

[4]     It doesn't seem to matter here, but the federal Declaratory Judgments Act, 28 U.S.C. § 2201, governs diversity cases in federal courts; analogous state statutes authorizing use of the declaratory judgment procedure in state courts do not apply.  *Carlson Holdings, Inc. v. NAFCO Ins. Co.*, 205 F. Supp. 2d 1069, 1074–75 (D. Minn. 2001); *see Utica Lloyd's of Tex. v. Mitchell*, 138 F.3d 208, 210 (5th Cir. 1998).

[5]     In compliance with Minn. Stat. § 65A.01, subd. 3, the Policy contains the following provision regarding appraisals:

>    **2.**     **<u>Appraisal</u>**
>
>    If we and you disagree on the value of the property, the amount of Net Income and operating expense, or the amount of "loss", either may make written demand for an appraisal of the "loss". In this event, each party will select a competent and impartial appraiser.  The two appraisers will select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having competent jurisdiction.  The appraisers will state separately the value of the property, the amount of Net Income and operating expense, and amount of "loss".  If

insurance appraisal . . . is expected to resolve all remaining matters to be resolved, without further litigation." *Id.* ¶ 2. Following a series of delays, the appraisal occurred November 9, 2020. *See* ECF Nos. 19–28. Rymer sought a total appraisal award of $2,114,200. Kane Aff., Ex. C-1 at 18 [ECF No. 51-3]. Relevant here, this amount included an award of $1,726,921.90 for the Mall's roof. *Id.* at 9. Rymer's position regarding the basic issues before the appraisal panel was clear. In a letter accompanying its submission to the panel, Rymer wrote:

> There are two issues for consideration at this appraisal. First, the panel should determine the scope of damage that exists at the Property from the September 20, 2018, storm. Second, the panel should determine the amount of loss, which includes the cost and scope of repair to repair the damage at the Property.

Kane Aff., Ex. C at 3. In other words, Rymer understood that the appraisal panel had to determine first what property damage was caused by the storm and, if any, then second the amount of loss. The Parties' appraisal submissions were extensive. *See* Kane Aff., Ex. A at 2–10 (Cincinnati's appraisal brief), and Ex. C at 2–4 (Rymer's). To summarize,

---

> they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will:
>
> **a.**   Pay its chosen appraiser; and
>
> **b.**   Bear the other expenses of the appraisal and umpire equally.
>
> If there is an appraisal, we still retain our right to deny the claim.

Policy at 52.

Cincinnati identified evidence it argued showed that the Mall's roof needed replacement and "had exceeded its useful life" for several years prior to the September 2018 storm. Kane Aff., Ex. A at 3–5. Cincinnati's exhibits included evidence of extensive previous leaks, *see, e.g.*, *id.*, Exs. A-6 at 48, A-9 at 80, and the report of a roofing contractor from October 2014 identifying numerous problems with the Mall's roof, *id.*, Ex. A-4. The contractor who prepared this report "recommend[ed] reroofing as soon as possible." *Id.* at 34. For its part, Rymer sought "replacement of all roofing and other building components[.]" *Id.*, Ex. C at 3. Rymer submitted the report of a contractor, Phil Simon, who identified roof damage caused by the storm. *Id.*, Ex. C-2. Simon acknowledged that portions of the roof were saturated, *id.* at 50, 55, and explained that the "Minnesota Building code requires all damaged and saturated roofing materials [to] be removed before repairing[,]" *id.* at 54.[6] To buttress Simon's description of the Minnesota Building Code, Rymer submitted correspondence from Goodhue County and a roofing manufacturer representing that the Code and manufacturer's specifications prohibited re-roofing over wet, water-damaged, or deteriorated materials. *Id.*, Exs. C at 2–3, C-3, and C-4.

*The appraisal award.* The panel issued its award the day of the appraisal. Essentially rejecting Rymer's claim, the panel awarded $23,226 for "Mall roof repair" and noted that this amount did not account for any deductible or prior payments Cincinnati may

---

[6]     Rymer has not identified any record evidence showing that Simon specifically connected the widespread saturation of roofing materials to the September 2018 storm. Though Simon's report notes widespread saturation, Kane Aff., Ex. C-2 at 39, 41, 42, 47, 50, 55, it notes the Mall "sustained severe wind damage," *id.* at 35, and does not explicitly or clearly attribute the widespread saturation of roofing materials to the storm. There is no transcript of the appraisal, or at least none has been filed.

have made.  ECF No. 28-1.  The next day, Rymer's counsel, Alexander Jadin, sought

clarification of the panel's roof-repair award.  Hammond Aff., Ex. B at 153.  Jadin wrote:

> In order to counsel Rymer Companies on what they need to do
> regarding the repairs, can the panel clarify what were the
> repairs that is [sic] listed on the award for the Mall roof repair
> ($23,226.00) . . . I'm not sure how to tie those repair numbers
> to the information the parties presented.

*Id.*  The panel's umpire, Kurt Ehlers, responded the next day, explaining that the panel's

award covered "[m]ain roof cap flashing repair on 5 locations," and attaching diagrams

identifying the locations.  *Id.*; *see also id.* at 159–60 (diagrams).

     *The denial of Rymer's building permit.*  On December 1, 2020, Rymer applied for a

building permit necessary to complete repairs to the Mall's roof.  Simon Aff., Ex. J at 6–7

[ECF No. 34-1].  Rymer's application described the work for which it sought a permit as

follows: "Tornado damage repair – remove metal gravel stop metal.  Install new hot asphalt

SBS modified at leading-edge under gravel stop, remove 100 SQ FT of existing roof (built-

up roof with ballast, insulation) at gravel stop junction and flash new materials into existing

satur[ated] roof system."  *Id.* at 6.  Rymer attached to the application a map of the roof

displaying moisture readings to support its description of the "roof system" as

"satur[ated]."  *Id.* at 7.  If Rymer's appraisal position that the "Minnesota Building code

requires all damaged and saturated roofing materials [to] be removed before repairing[,]"

*id.* Ex. C-2 at 54, was accurate, then Rymer's admission on its building-permit application

that the roof system was "satur[ated]" invited denial of the application.  And that is what

happened.  Goodhue County denied the application on the grounds that Rymer's proposal

did not "comply with the manufacturer's requirements nor with requirements in the building Code." Simon Aff., Ex. J at 4.[7]

    *The Parties' return to court.*  In a letter dated January 8, 2021, Rymer confirmed that the appraisal had occurred, but explained that the Parties had "drastically different perspectives on the status of the claim and remaining coverage issues." ECF No. 27 at 1. Rymer explained that its building-permit application had been denied and that, in its view, this denial triggered Policy language requiring Cincinnati to "pay for the increased costs for compliance with applicable ordinances and laws governing the actual repair of the property." *Id.* (The Parties refer to this Policy language as the "Ordinance or Law" provision, and that convention will be followed here.) In a separate letter filed the same day, Cincinnati explained its position that the appraisal award was final and binding under Minnesota law and that, as a result, "the matter pending before the Court can and should be dismissed with prejudice." ECF No. 28 at 4. The Parties subsequently filed cross-motions for summary judgment. ECF Nos. 30, 48.

---

[7]    Goodhue County cited no code provision in its written denials of Rymer's building-permit application. *See* Simon Aff., Ex. J at 4–6. In its earlier letter submitted to the appraisal panel, however, the County cited Section 1511 of the Minnesota Building Code as "prohibit[ing] recovering a roof that is water damaged or deteriorated." Kane Aff., Ex. C-3. The Code defines a "roof recover" as the "process of installing an additional *roof covering* over a prepared existing *roof covering* without removing the existing *roof covering*." 2020 Minn. Bldg. Code § 202, *available at* https://codes.iccsafe.org/content/MNBC2020P1 (emphasis in original). Section 1511 permits a roof recover in some cases, including "[w]here the new roof covering is installed in accordance with the roof covering manufacturer's approved instructions." *Id.* § 1511.3.1. The same section also prohibits a roof recover in some cases, including "[w]here the existing roof or roof covering is water soaked or has deteriorated to the point that [it] is not adequate as a base for additional roofing." *Id.* § 1511.3.1.1.

II

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Id.* at 255 (citation omitted). Courts take a "slightly modified" approach when, as here, both parties have moved for summary judgment. *Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012). In resolving Rymer's motion, the record is viewed in the light most favorable to Cincinnati, and in resolving Cincinnati's motion, the record is viewed in the light most favorable to Rymer. *See id.* "[T]he filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the case to a plenary determination on the merits." *Young Am.'s Found. v. Kaler*, 482 F. Supp. 3d 829, 851 (D. Minn. 2020) (citations omitted).

"Federal courts sitting in diversity apply state substantive law." *Morgantown Mach. & Hydraulics of Ohio, Inc. v. Am. Piping Prods., Inc.*, 887 F.3d 413, 415 (8th Cir. 2018) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). The Parties agree that Minnesota law governs interpretation of the Policy. *See* Defs.' Mem. in Supp. at 10 [ECF No. 32]; Pl.'s Mem. in Supp. at 15 [ECF No. 50]. There is no reason to second-guess the

Parties' agreement on the choice-of-law question, so Minnesota law will be applied here. *See Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 913 (8th Cir. 2014) ("Because the parties do not dispute the choice of Minnesota law, we assume, without deciding, Minnesota law applies[.]"); *see also Progressive N. Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010). In applying Minnesota law, a federal district court sitting in diversity "must predict how the Supreme Court of Minnesota would rule, and . . . follow decisions of the [Minnesota Court of Appeals] when they are the best evidence of Minnesota Law." *Netherlands Ins. Co.*, 745 F.3d at 913 (quoting *Friedberg v. Chubb & Son, Inc.*, 691 F.3d 948, 951 (8th Cir. 2012)).

The presence of an appraisal award implicates *Quade v. Secura Ins.*, 814 N.W.2d 703 (Minn. 2012), in which the Minnesota Supreme Court drew a line between the authority of appraisers on the one hand, and courts on the other, in resolving insurance disputes. *Quade*'s basic rule is "that the phrase 'amount of loss,' as it relates to the authority of the appraiser under the policy, unambiguously permits the appraiser to determine the cause of the loss." *Id.* at 704. In other words, "in the insurance context, an appraiser's assessment of the 'amount of loss' necessarily includes a determination of the cause of the loss, and the amount it would cost to repair that loss." *Id.* at 706. "But an appraiser's liability determinations are not 'final and conclusive.'" *Id.* at 707 (quoting *Itasca Paper Co. v. Niagara Fire Ins. Co.*, 220 N.W. 425, 427 (Minn. 1928)). "Importantly, an appraisal award 'does not preclude the insurer from subsequently having its liability on the policy judicially determined.'" *Id.* (quoting *Itasca Paper Co.*, 220 N.W. at 427). *Quade*'s upshot, then, is that appraisers have authority to resolve damage questions

11

and causation questions necessary to resolving those damage questions, and courts have authority to resolve coverage questions remaining after the appraisal, *id.* at 707–08, though "the line between liability and damage questions is not always clear," *id.* at 706.

The Parties disagree regarding *Quade*'s impact here. Cincinnati's primary argument is that the appraisal award was conclusive on all issues concerning Cincinnati's liability under the Policy and that *Quade* precludes judicial review of the award. *See, e.g.*, Pl.'s Mem. in Supp. at 2 (arguing that the appraisal panel's determination "is conclusive and binding[]" and that "no remaining justiciable issues exist"). Rymer approaches the issue differently. Rymer says essentially that its claims do not challenge the appraisal award, but rather seek additional amounts under a Policy term—the Ordinance or Law provision— not considered by the appraisal panel. *See* Def.'s Reply Mem. at 3 [ECF No. 56] ("It is undisputed that there is a valid appraisal award."); Def.'s Mem. in Opp'n at 3, 8 [ECF No. 57]. As Rymer explains its position:

> Rymer's breach of contract claim arises from Cincinnati's failure to pay for increased costs of construction under the Ordinance or Law provision of the Policy. The damages are the difference between the amount of the loss in the Appraisal Award for Mall roof repairs and the cost of roof repairs mandated by the Goodhue County Building Official for full replacement. The appraisal panel's findings triggered the Building Code which triggers the Ordinance or Law coverage provision.

Def.'s Mem. in Opp'n at 3. According to Rymer, "[i]f an appraisal award does not address additional coverage, as in this case, then the court is authorized to and must add to the total amount of the loss." *Id.* at 8.

Though it's iffy, Rymer seems to have the better understanding of *Quade*. As Rymer has described its claim for a full-roof replacement under the Ordinance or Law provision, the claim could not have been addressed by the appraisal panel. Rymer's position is that "[t]he appraisal panel's findings triggered the Building Code which triggers the Ordinance or Law coverage provision." Def.'s Mem. in Opp'n at 3. In other words, Rymer's claim under the Ordinance or Law provision arose only after the panel issued its appraisal and Goodhue County denied Rymer's building-permit application. The legal question of whether the Ordinance or Law provision affords coverage under these circumstances seems like the kind of coverage question *Quade* intended to reserve for a court to decide.

Rymer's understanding of the Ordinance or Law provision, however, is not correct. The Ordinance or Law provision appears in a section of the policy entitled "**Additional Coverages**." Policy at 36, 38–39. In pertinent part, the provision says that Cincinnati will cover certain losses (and not others):

> **(1)** If a Covered Cause of Loss occurs to a covered building or structure, *resulting in* the enforcement of an ordinance or law that:
>
> > **(a)** Requires the demolition of undamaged parts of covered buildings or structures that are damaged or destroyed by a Covered Cause of Loss; or
> >
> > **(b)** Regulates the construction or repair of buildings or structures, or establishes building, zoning, or land use requirements at the "premises"; and
> >
> > **(c)** Is in force at the time that "loss" is sustained[.]

*Id.* at 38–39 (emphasis added).[8]

In other words, for this provision to apply, a "Covered Cause of Loss" must "result in" (or cause) "the enforcement of an ordinance or law." *Id.* There is no dispute that the windstorm is a "Covered Cause of Loss." And there is no dispute that the code provision enforced by Goodhue County in denying Rymer's building-permit application fell at least within subparagraph (b) (because it "[r]egulates the construction or repair of buildings or structures") and satisfied subparagraph (c) because it was "in force" when the storm occurred in September 2018.[9] Whether this Ordinance or Law provision applies, then, boils down to whether the storm "resulted in" the County's code enforcement. Importantly, it is Rymer's burden to show coverage under this provision. *Eng'g & Constr. Innovations,*

---

[8] The Policy includes two other ordinance-or-law provisions. (1) The first is a provision excluding coverage for loss caused by "[t]he enforcement of any ordinance or law[.]" Policy at 71–72 (replacing standard ordinance-or-law exclusion at Policy 30–31). This provision's meaning is not obvious. Regardless, though it quotes the provision in its briefing, Pl.'s Mem. in Opp'n at 4–5, 10 [ECF No. 55], Cincinnati does not argue that the provision excludes an otherwise covered loss here. As an alternative to its argument that *Quade* bars consideration of Rymer's claim, Cincinnati argues only that the Ordinance or Law provision relied on by Rymer does not afford coverage. *See id.* at 10–18. (2) The second other ordinance-or-law related provision in the Policy appears in an endorsement entitled "**Building Laws Safeguard Coverage**." Policy at 76–77. As with the exclusion just discussed, this provision's meaning is not obvious. But it doesn't matter. Though Rymer suggests the provision "adds additional coverage for Ordinance or Law[,]" Def.'s Reply Mem. at 13, Rymer nowhere explains why this is so and advances no discernible argument for coverage under this provision beyond this single conclusory assertion. Any argument that this provision affords coverage separately from the Ordinance or Law provision, therefore, has been forfeited. *See Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 341 (8th Cir. 2018) ("Since [the defendants] do not develop their argument beyond that single sentence, we hold that they have forfeited it.").

[9] Cincinnati does not dispute that the County's permit denial was "enforcement" as that word is intended in the Ordinance or Law provision. Therefore, that question is not considered here.

*Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 705 (Minn. 2013) ("It is well-established 'that the burden of proof rests upon the party claiming coverage under an insurance policy.'") (quoting *Boedigheimer v. Taylor,* 178 N.W.2d 610, 614 (1970)).

A key interpretive question left unaddressed by the Parties' summary-judgment submissions is the meaning of the phrase "resulting in" as it is used in the Ordinance or Law provision, but Minnesota law provides a reasonably clear answer. "'Where there is no textual or contextual indication to the contrary, courts regularly read phrases like 'results from' to require but-for causality.'" *Micks v. Gurstel Law Firm, P.C.*, 365 F. Supp. 3d 961, 976 (D. Minn. 2019) (quoting *Burrage v. United States*, 571 U.S. 204, 212 (2014)). This is true of courts interpreting insurance policies under Minnesota law. *E.g.*, *Bolin v. Hartford Life & Acc. Ins. Co.*, 28 F. Supp. 3d 915, 918–19 (D. Minn. 2014); *Eng'g & Constr. Innovations, Inc. v. W. Nat'l Mut. Ins. Co.*, No. A12-1785, 2013 WL 2460400, at *6 (Minn. Ct. App. June 10, 2013), *review denied*, (Minn. Aug. 20, 2013). "This standard ordinarily requires a showing that the harm would not have occurred in the absence of— that is, but for—the defendant's conduct," *Micks*, 365 F. Supp. 3d at 976 (cleaned up), or here, that the County's code enforcement would not have occurred but for the September 2018 storm. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013) (quoting Restatement of Torts § 431, Comment a (negligence)). "[An] action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" *Id.* (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 265 (5th ed. 1984)).

It is true that courts applying Minnesota law have less frequently analyzed but-for causation in the context of insurance policies using the phrase "resulting in," but they have done so often in the context of insurance policies using the phrase "arising out of," a phrase that shares the "same . . . plain and ordinary meaning" as "resulting from." *Eng'g & Constr. Innovations, Inc.*, 2013 WL 2460400, at *6 (quoting *SECURA Supreme Ins. Co. v. M.S.M.*, 755 N.W.2d 320, 326 (Minn. Ct. App. 2008)) (internal quotation marks omitted); *see In re RFC & RESCAP Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1164 (D. Minn. 2018) (same, collecting cases); *Murray v. Greenwich Ins. Co.*, 533 F.3d 644, 649 (8th Cir. 2008) (recognizing that "arising out of" generally connotes "but for causation") (quoting *Faber v. Roelofs*, 250 N.W.2d 817, 822 (Minn. 1974) (cleaned up)).

In these cases, "Minnesota courts have been clear that something more than *literal* but-for causation is necessary to find that an injury 'arose out of' a particular event or circumstance." *Capitol Indem. Corp. v. Ashanti*, 28 F. Supp. 3d 877, 883 (D. Minn. 2014). For example, many decisions have considered whether, under Minnesota's No-Fault Act, an injury "arose out of the ownership, maintenance, or use of" a motor vehicle. In that context, a sufficient causal connection is shown when "the injury is a natural and reasonable incident or consequence" of the vehicle's use, but not if it was "the mere situs of the injury." *Dougherty v. State Farm Mut. Ins. Co.*, 699 N.W.2d 741, 743–44, 746 (Minn. 2005) (citations omitted); *see also Tlougan v. Auto-Owners Ins. Co.*, 310 N.W.2d 116, 116–17 (Minn. 1981) (burns suffered by child playing with matches left in truck because of its inoperable cigarette lighter did not arise out of the truck's use); *State Farm Fire & Cas. Co. v. Strope*, 481 N.W.2d 853, 854–56 (Minn. Ct. App. 1992) (gun misfire

injuring passenger while commuting in truck did not arise out of the truck's use). *Ashanti* is especially instructive. There, the court interpreted an endorsement to a daycare company's business liability policy. The endorsement limited coverage to bodily injury "arising out of" the daycare. 28 F. Supp. 3d at 881. The court held that a worker's injury did not "arise out of" the daycare, even though it was "literally true that, but for [her] work in the daycare, she would not have been present in [the daycare] and therefore would not have been struck by [a] bullet" misfired by a non-employee in another room. *Id.* at 883–86. "To say that an injury must arise out of a business" was "necessarily to require some connection between the injury and the conduct and activities of the business." *Id.* at 886. This wasn't true in *Ashanti* because, whether "a daycare worker or merely a visitor," the "injury would have been the same." *Id.*

Here, Rymer has not carried its burden to identify evidence from which a fact finder might reasonably conclude that the September 2018 windstorm (*i.e.*, the "Covered Cause of Loss") was a but-for cause of Goodhue County's denial of Rymer's building permit. Rymer never acknowledges it has this particular burden, so it doesn't really attempt to meet it. Rymer cites neither law regarding but-for causality nor facts tending to show the storm was a but-for cause of the County's permit denial. It points to the issue when it summarizes the Ordinance or Law provision's elements accurately, Def.'s Mem. in Supp. at 12, but Rymer then merely asserts that facts establishing each element are undisputed, *id.* ("None of these facts are disputed, therefore, it is undisputed that the Ordinance or Law coverage applies."). That is not correct. Showing a but-for causal relationship between the storm and the County's enforcement decision is Rymer's burden and, in any event, Cincinnati

disputes this point.  *See* Pl.'s Mem. in Opp'n at 10–18 [ECF No. 55].  Rymer later asserts

in a single sentence: "Contrary to Cincinnati's assertions, direct physical damage to the

roof caused by the Storm resulted in enforcement of the Building Code."  Def.'s Reply

Mem. at 6.  But the three pages of record evidence Rymer cites in support of this assertion,

Simon Aff., Ex. J, do not support it.  These three pages are an email and document from

the County simply communicating its decision to deny Rymer's building permit.  They

cannot reasonably be understood to show a but-for causal connection between the storm

and the denial.  A careful review of Rymer's briefs shows that Rymer seeks nowhere else

to establish a but-for causal connection between the storm and the County's permit denial.[10]

The precise reason for the County's decision to deny Rymer's permit application

was the Mall roof's "wet" condition, but Rymer nowhere suggests that the September 2018

storm caused this widespread condition.  To recap, in a September 22, 2020 letter to Simon,

Goodhue County Permit Supervisor Michele Engberg explained: "The Code prohibits

recovering a roof that is water damaged or deteriorated."  Simon Aff., Ex. G.  In its

December 1, 2020 application for a building permit, however, Rymer explained that it

---

[10]     Rymer repeatedly attributes the cause of the County's permit denial to the scope of
the appraisal panel's decision.  *E.g.*, Def.'s Mem. in Opp'n at 3 ("The appraisal panel's
findings triggered the Building Code which triggers the Ordinance or Law coverage
provision."); 8 (characterizing the "**denial of the building permit [as] based on the
appraisal panel's scope of damage determination**" and stating "the appraisal panel did
not and could not have anticipated that the Goodhue County Building Official would deny
a building permit based on [the appraisal panel's] determination of scope of damage").
Saying that the appraisal panel's decision or its scope caused the County to deny Rymer's
permit application is different from saying the denial was caused by the September 2018
storm.  This assertion does not create a trial-worthy issue regarding whether the storm was
a but-for cause of the permit denial.

planned to do just that: "remove 100 SQ FT of existing roof (built-up roof with ballast, insulation) at gravel stop junction and flash new materials into existing saturated roof system." *Id.*, Ex. J at 6; *see id.*, Ex. I (explaining same and showing specific areas to be repaired). As noted earlier, *supra* at 7 n.6, it is unclear whether Rymer argued to the appraisal panel that the September 2018 storm caused the roof's extensive wet condition. Regardless of whether Rymer advanced this position, the appraisal panel's award necessarily (if implicitly) rejected it. Rymer sought a full roof replacement, Kane Aff., Ex. C at 3 ("Cannon Falls Mall is seeking replacement of all roofing . . . components from the Loss."), but the panel awarded only $23,226 for "Mall roof repair," Hammond Aff., Ex. E. The dollar value of the award is enough to show the panel's rejection of any argument that the storm caused the roof's wet condition. If that weren't enough, in a message following the appraisal, Rymer's appointed appraiser, Kevin Baker, explained he "was sided against on a full roof replacement" and that "[t]he other two members felt, it was not demonstrated new water was introduced to the roof system and only localized repairs were warranted based on direct physical damage." *Id.*, Ex. F. In this suit, Rymer has been clear and consistent that it "does not seek to challenge the Appraisal Award[,]" Def.'s Mem. in Opp'n at 1, and considers it "undisputed that there is a valid appraisal award," Def.'s Reply Mem. at 3. Rymer's acceptance of the appraisal award probably explains why it does not seek to show in this case that the September 2018 storm caused the roof's generalized wet

condition.[11]  In any event, under the but-for causality requirement of the Ordinance or Law provision, this failure is fatal to Rymer's coverage claim.

Persuasive authorities from other jurisdictions support the entry of summary judgment against Rymer.  In *St. George Tower & Grill Owners Corp. v. Insurance Co. of Greater New York*, for example, a covered flooding event caused mold in an apartment building, which in turn required the removal of internal finishes in some units.  139 A.D.3d 200, 202 (N.Y. App. Div. 2016).  The owner applied for a building permit to repair the damage.  *Id.*  During inspection, however, "it was discovered that the concrete slabs under the flooring were in a distressed and deteriorated condition" that violated the city's building code.  *Id.*  The parties agreed the flooding had not damaged the concrete slabs.  *Id.*  The code nonetheless required the owner to fix them before a building permit could issue to repair the covered flooding damage.  *Id.*  Like Rymer, the apartment building's owner sought coverage under a nearly identical ordinance or law coverage endorsement, positing that either the flooding had "resulted in" code enforcement or that he incurred "increased costs" to make repairs as "a consequence of enforcement."  *Id.* at 203.  The court denied coverage: "there must be some direct connection between the covered damage and the enforcement of the ordinance, and the necessity of a relationship between the damage and the code enforcement work is not satisfied by the fact that the covered work cannot be

---

[11]    Under *Quade*, it is doubtful whether Rymer could have challenged this aspect of the appraisal award.  To summarize, the panel's determination of the "amount of loss" here necessarily included a determination that the storm did not cause widespread saturation of roofing materials.  *Quade* says the resolution of this kind of question is within the authority of an appraiser and is not susceptible to a challenge before a district court.  814 N.W.2d at 706–08.

completed until the code-compliant repairs are performed." *Id.* at 206. To hold otherwise, the court reasoned, would mean "even an inspector's discovery of code violations resulting from shoddy original construction" would render the insurer liable "any time the problem happened to be uncovered in the course of damage remediation." *Id.*; *see Sanderson v. First Liberty Ins. Corp.*, No. 8:16-CV-644, 2019 WL 2009332, at *6 (N.D.N.Y. May 7, 2019) (rejecting coverage where "shoddy work" needing "upgrade[] to meet code [was] wholly unrelated to . . . water damage covered by the homeowner's policy"); *Chattanooga Bank Assocs. v. Fid. & Deposit Co. of Md.*, 301 F. Supp. 2d 774, 780 (E.D. Tenn. 2004) (finding no ordinance or law coverage where the code-triggering damage "existed independent of the fire and the fire cannot be said to have 'caused' the enforcement of a building code, which was at all times subject to enforcement"); *St. Paul Fire & Marine Ins. Co v. Darlak Motor Inns, Inc.*, No. 3:97-CV-1559 TIV, 1999 WL 33755848, at *1 (M.D. Pa. Mar. 9, 1999) (finding "that the independent existence of the code violations, not the fire, caused the enforcement of the code" and holding that the insured's costs to bring its building into compliance were therefore not covered under an ordinance or law provision).

*

The determination that Rymer has not carried its burden to identify evidence from which a fact finder might reasonably conclude that the September 2018 windstorm was a but-for cause of Goodhue County's denial of Rymer's building permit means that Rymer's summary-judgment motion must be denied and Cincinnati's motion granted.

**ORDER**

Therefore, based on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.      Defendants' Motion for Summary Judgment [ECF No. 30] is **DENIED.**

2.      Plaintiff's Motion for Summary Judgment [ECF No. 48] is **GRANTED**.

3.      This action is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: May 13, 2021                    s/ Eric C. Tostrud
                                       Eric C. Tostrud
                                       United States District Court